IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KENNETH D. SMITH,

        Petitioner,                No. CIV S-04-0497 LKK DAD P

    vs.

G.J. GIURBINO,

        Respondent.            <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with an amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in which he challenges his 2000 judgment of conviction entered in the Yolo County Superior Court for second degree murder in violation of California Penal Code § 187(a).

        Petitioner seeks federal habeas relief on the grounds that: (1) the trial court erred in allowing the victim's son to testify; (2) the trial judge improperly instructed the jury; (3) the prosecutor was improperly allowed to introduce into evidence hearsay statements against petitioner; (4) petitioner's trial counsel rendered ineffective assistance; (5) petitioner was not tried by a jury of his peers; (6) his conviction was the result of an overzealous prosecution; (7) there was insufficient evidence introduced at trial to support his conviction; and (8) the evidence presented at trial supported only a conviction on a lesser offense.

1   Upon careful consideration of the record and the applicable law, the undersigned

2   will recommend that petitioner's application for habeas corpus relief be denied.

3                                    PROCEDURAL BACKGROUND

4   On September 29, 2000 a Yolo County Superior Court jury found petitioner guilty

5   of second degree murder.  (Notice of Lodging Documents on April 14, 2004 (Doc. No. 4),

6   Clerk's Transcript on Appeal (CT) at 412.)  Following his conviction, petitioner was sentenced

7   on October 30, 2000, to state prison for an indeterminate term of fifteen years to life.  (Id. at

8   460.)

9   Petitioner appealed his judgment of conviction to the California Court of Appeal

10  for the Third Appellate District.  On November 26, 2001, the judgment of conviction was

11  affirmed in a reasoned opinion.  (Doc. No. 4, Ex. C.)  Petitioner then filed a petition for review

12  with the California Supreme Court.  (Doc. No. 4, Ex. D.)  On February 13, 2002, the California

13  Supreme Court summarily denied that petition.  (Doc. No. 4, Ex. E.)

14  On March 14, 2003, petitioner filed a petition for writ of habeas corpus in the

15  Yolo County Superior Court.  (Doc. No. 4, Ex. G.)  That petition was denied on March 26, 2003.

16  (Id.)  Petitioner thereafter filed a petition for writ of habeas corpus in the California Court of

17  Appeal for the Third Appellate District on May 5, 2003.  (Doc. No. 4, Ex. H.)  That petition was

18  denied on May 8, 2003.  (Doc. No. 4, Ex. I.)  On May 19, 2003, petitioner filed a petition for a

19  writ of habeas corpus in the California Supreme Court.  (Doc. No. 4, Ex. J.)  That petition was

20  denied on January 28, 2004.  (Doc. No. 4, Ex. K.)

21  On March 12, 2004, petitioner filed his original petition for a writ of habeas

22  corpus in this court.  (Doc. No. 1.)  Respondent filed an answer to that petition on April 14, 2004.

23  (Doc. No. 4.)  On July 1, 2004, petitioner moved for leave to amend his petition to add three new

24  claims.  (Doc. No. 6.)  Thereafter, on December 1, 2004, petitioner filed a motion to hold these

25  proceedings in abeyance to allow him the opportunity to exhaust his three new unexhausted

26  claims in state court.  (Doc. No. 12.)  On May 18, 2005, petitioner's motion was granted and this

2

1  action was stayed.  (Doc. No. 16.)

2           On June 24, 2005, petitioner filed a second state habeas petition in the Yolo

3  County Superior Court raising his three unexhausted claims.  (Notice of Lodging Documents on

4  October 27, 2009 (Doc. No. 78) Resp't's Lod. Doc. 1.)  That petition was denied on procedural

5  grounds on July 26, 2005.  (Resp't's Lod. Doc. 2.)  Petitioner next filed a habeas petition in the

6  California Court of Appeal on August 10, 2005, again raising his three unexhausted claims.

7  (Resp't's Lod. Doc. 3.)  That petition was summarily denied on August 18, 2005.  (Resp't's Lod.

8  Doc. 4.)  On August 15, 2008, petitioner filed a state habeas petition raising the three

9  unexhausted claims in the California Supreme Court.[1]  (Resp't's Lod. Doc. 5.)  That petition was

10  denied on procedural grounds on February 18, 2009.  (Resp't's Lod. Doc. 6.)

11          On April 24, 2009, petitioner filed a motion to lift the stay in this action.  (Doc.

12  No. 68.)  That motion was granted on July 15, 2009.  (Doc. No. 68.)  That same day petitioner

13  filed the amended petition now before the court.  (Doc. No. 69. - "Am. Pet.")  Respondent filed

14  an answer on October 27, 2009.  (Doc. No. 77 - "Answer.")  Petitioner filed his traverse on June

15  11, 2010.  (Doc. No. 91 - "Traverse.")

16                                  FACTUAL BACKGROUND

17          In its unpublished memorandum and opinion affirming petitioner's judgment of

18  conviction, the California Court of Appeal for the Third Appellate District provided the

19  following factual summary:

20          Early in the morning of October 27, 1998, volunteer firefighters
            responded to a head-on auto accident on South River Road.
21          Defendant remained conscious, and when asked, "Where do you
            hurt," he answered, "I was trying to do suicide."  Defendant was
22          then asked his name, he answered, "Ken, Kenny Smith.  I was
            trying to do suicide."  The driver of the other vehicle, Brian
23          Tenney, was found dead.

24

25          [1] Respondent asserts that during the intervening three years petitioner was under the
    mistaken belief that his August 10, 2005 petition filed in the California Court of Appeal was still
26  pending before that court, and that counsel for respondent notified petitioner of this error in July
    of 2008.  (Answer at 13.)

Approximately one month earlier, Officer Stokes found defendant sitting by the side of a road in his underwear and bathrobe. He had a gun with three spent shell casings and three live bullets. After he was taken into custody, he told Officer Stokes he was sitting by the side of the road because "[h]e wanted to commit suicide." He related that earlier that evening he and his girlfriend, Michelle Hughes, had had an argument, because she wanted to break off their relationship.

After his release from custody, defendant and Hughes continued to live together. But their relationship continued to deteriorate, and a few days before the collision, Hughes moved out of the bedroom. This arrangement upset defendant.

On October 26, 1998, defendant and Hughes got into an argument. Hughes informed defendant she no longer wanted to even be friends. In the course of the fight that ensued, defendant repeatedly threatened suicide and discussed various means of killing himself. He straddled Hughes and put his hands on her neck, telling her he wanted her to hate him "so that [she] would let him kill himself." Defendant broke a candleholder over his head and held a knife pointed toward his chest. Defendant told Hughes "he wanted to sit in his car in our garage with the car running." Later, Hughes found him in the car with the engine running. Defendant also poured gasoline on a rag and "mentioned putting it in his gas tank." Finally, before leaving the house, defendant told Hughes he had considered other options for killing himself, but thought the garage method would be the best.

An accident reconstruction expert testified that "neither party applied the brakes hard enough to make the tires lock and leave skid marks...." Both vehicles had their low beam headlights on, and there were no mechanical defects in the braking system of either vehicle. Defendant was not wearing a seatbelt at the time of the collision.

Defendant's car was traveling between 63 and 76 miles per hour in a 50-mile-per-hour zone. At the time of impact, his car was three and one-half feet over the center line and turned "approximately eight degrees" toward Tenney's truck. The steering components of defendant's car indicated he had tried to steer sharply right, away from Tenney's truck. However, due to the speed he was traveling and the "lag time" between steering input and a change of direction of the car, there was not sufficient time for the vehicle to actually turn. The reconstruction evidence also indicated that defendant's car did not simply drift across the center line. Also, because the road was slightly higher at the center than on the shoulder, if a driver removed his hands from the steering wheel, the car would "tend to go to the right" or away from Tenney's truck.

/////

4

Over defense counsel's relevancy objection, Brian Tenney's teenage son, Alex Tenney, was allowed to testify.  Alex identified a picture of his father, testified his father was an electrical contractor who drove a white pickup truck with utility beds on it.  Alex also testified his father usually went to work between 5:00 and 6:00 o'clock in the morning.  On the morning of October 27, 1998, he saw his dad leaving for work.  Brian had walked through his son's room, so as not to wake Alex's mother.  As he was passing through, he woke Alex.  Alex said, "Hi, Dad," and Brian said hello, then Alex said goodbye.  Alex also testified the collision site was approximately a mile and one-half north of their home, and north was the direction that his father usually traveled to work.

In his defense, defendant presented evidence that he was not suicidal.  Police interviews with Hughes in October and November 1998, revealed that Hughes was not certain whether defendant was actually planning to kill himself or just trying to make her feel guilty over their separation.

Dr. Paul Wuehler, a forensic psychologist noted that in his review of the various records, defendant had not been placed on a suicide watch at the hospital by either hospital that provided him treatment after the collision, nor had defendant ever been hospitalized for medical problems. Dr. Wuehler also testified that people who are serious about suicide, particularly men, do not tell others of their intentions ahead of time.  Dr. Wuehler specifically indicated that defendant's suicidal comments during the October 26, 1998, argument with Hughes appeared to be an attempt to manipulate Hughes into changing her mind about breaking up with him.

Defendant also presented evidence that from January 1989 through July 1999, there were 200 accidents in the vicinity where this collision occurred.  Ten of those accidents were head-on collisions, three of which were alcohol or drug related.

On June 4, 1999, defendant was charged by information with the murder of Brian Tenney in violation of Penal Code section 187.  Jury trial commenced on March 7, 2000, and on March 20, 2000, a mistrial was declared because the jury could not reach a unanimous verdict.  Retrial commenced on September 20, 2000.  On September 29, 2000, after approximately seven hours of deliberations, the jury returned a verdict finding defendant guilty of second degree murder.  Defendant was sentenced to 15 years to life.

(Doc. No. 4, Ex. C at 1-5 (hereinafter Opinion).)

/////

/////

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Title 28 U.S.C. § 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

1   we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

2   error, we must decide the habeas petition by considering de novo the constitutional issues

3   raised.").

4           The court looks to the last reasoned state court decision as the basis for the state

5   court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

6   state court decision adopts or substantially incorporates the reasoning from a previous state court

7   decision, this court may consider both decisions to ascertain the reasoning of the last decision.

8   Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

9   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

10  habeas court independently reviews the record to determine whether habeas corpus relief is

11  available under § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v.

12  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached

13  the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's

14  deferential standard does not apply and a federal habeas court must review the claim de novo.

15  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

16  II.  Petitioner's Claims

17          A.  Procedural Default

18          Respondent asserts that with the exception of petitioner's claims challenging the

19  admission of Alex Tenney's testimony, certain jury instructions and whether he received

20  effective assistance of counsel (claims one, two and four), his remaining claims are procedurally

21  barred.  In this regard, respondent notes that petitioner's claim that the prosecution was

22  improperly allowed to introduce hearsay statements into evidence (claim three) and his claim that

23  he was not tried by a jury of his peers (claim five) were raised in petitioner's March 14, 2003

24  habeas petition filed in the Yolo County Superior Court.  (Answer at 23-24, 30.[2])  Respondent

25  _____

26      [2] Page number citations such as this one are to the page number reflected on the courts
CM/ECF system and not to page numbers assigned by the parties.

argues that the Yolo County Superior Court denied habeas relief with respect to those claims on the grounds that the claims should have been raised on direct appeal pursuant to the rule established in In re Dixon, 41 Cal. 2d 756 (1953).  (Id. at 24, 30.)

Respondent also asserts that petitioner's claims that his conviction was the result of an overzealous prosecution (claim six), that there was insufficient evidence introduced at trial to support his conviction (claim seven), and that the evidence presented at his trial supported only a conviction on a lesser offense (claim eight) were raised in petitioner's habeas petition filed in the California Supreme Court on August 15, 2008, and that petition was denied with citations to the decisions in In re Robbins, 18 Cal. 4th 770, 780 (1998), In re Clark, 5 Cal. 4th 750 (1993), In re Lindley, 29 Cal. 2d 709 (1947), and in In re Dixon, 41 Cal.2d 756, 759 (1953).  (Answer at 35, 38, 42.)

Respondent contends that these rulings by the Yolo County Superior Court and the California Supreme Court constitute a procedural bar, precluding this court from addressing the merits of the claims rejected on procedural grounds by the state courts.

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977).  As a general rule, a federal habeas court "'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  The state rule for these purposes is only "adequate" if it is "firmly established and regularly followed."  Id. (quoting Ford v. Georgia, 498 U.S. 411, 424 (1991)).  See also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and consistently applied.")  The state rule must also be "independent" in that it is not "interwoven with the federal law." Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the challenged

1   claims may be reviewed by the federal court if the petitioner can show: (1) cause for the default

2   and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to

3   consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at

4   749-50.

5            A reviewing court need not invariably resolve the question of procedural default

6   prior to ruling on the merits of a claim where the default issue turns on difficult questions of state

7   law. Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Busby v. Dretke, 359 F.3d

8   708, 720 (5th Cir. 2004). Under the circumstances presented here, this court finds that

9   petitioner's claims can more easily be resolved by addressing them on the merits. Accordingly,

10  this court will assume that petitioner's claims are not procedurally defaulted. Below, the court

11  will address each of petitioner's claims on the merits.

12       B. Testimony of Victim's Son

13           Petitioner claims that the trial court erred in allowing the victim's son, Alex

14  Tenney, to testify at trial. Petitioner argues that the testimony in question was irrelevant and

15  prejudicial. (Am. Pet. at 4.)

16           The California Court of Appeal specifically rejected petitioner's challenge to Alex

17  Tenney's testimony. In doing so, the court reasoned as follows:

18              Defendant contends the trial court committed reversible error by
                admitting the testimony of the victim's son, Alex. He argues the
19              testimony was both irrelevant and "[i]n the alternative, any
                marginal relevance of the boy's testimony was outweighed by its
20              prejudicial nature." In both respects, defendant's argument is
                insufficient.
21
                Relevant evidence is evidence that has "any tendency in reason to
22              prove or disprove any disputed fact that is of consequence to the
                determination of the action." (Evid. Code, § 210.) The trial court
23              has great discretion in deciding to admit or exclude evidence and
                its decision is reviewable only for abuse of discretion. (People v.
24              Rodriguez (1999) 20 Cal.4th 1, 9.) Absent a showing that the trial
                court exercised its discretion in an "arbitrary, capricious, or
25              patently absurd manner" which caused a miscarriage of justice, its
                ruling will stand. (Id. at pp. 9-10.) Assuming that Alex's
26              testimony was not relevant to any issue in dispute at trial,

9

defendant has made no showing that the admission of this testimony resulted in a miscarriage of justice.

We first note that Alex's testimony represents approximately a page and one-half in almost 400 pages of trial transcript.  More importantly, the record contains strong evidence that defendant was intent on committing suicide, and ultimately decided to achieve this goal by causing a head-on collision.

Approximately one month prior to the accident, after his girlfriend told him she wanted to break up, defendant was found on a rural road, in his underwear and a bathrobe with a loaded gun.  He told the officer who found him that he was going to commit suicide.

On October 26, 1998, defendant and his girlfriend had another argument about terminating their relationship.  During this argument, defendant repeatedly threatened suicide.  He indicated he wanted to sit in the car in the garage with the car running, and in fact started the car running with the garage closed, held a knife pointed to his chest, and poured gasoline on a rag and "mentioned putting it in his gas tank."  Defendant also told his girlfriend he had contemplated various methods of killing himself, including driving his car into water.

The accident reconstruction team determined there were no mechanical defects in the braking systems of either vehicle and the headlights of both were on at the time of the collision. Defendant was not wearing his seatbelt, and had been traveling between 63-76 miles per hour in a 50-mile-per-hour zone.  The sharp angle of impact indicated it was unlikely that defendant's car had simply drifted into the oncoming lane.  Similarly, the banking of the road suggested if a driver took his hands off the wheel, the vehicle would have gone off to the shoulder, not toward oncoming traffic.

Finally, after the accident, defendant told the responding emergency workers he was trying to commit suicide.  He also indicated he had caused the collision on purpose.

Alex identified a picture of his father, confirmed his father was an electrical contractor who drove a white pickup truck with utility beds, and testified he saw his father leave the house for work the morning of the accident.  His father walked through Alex's room so as not to wake Alex's mother, and the father and son greeted each other.  Finally, Alex indicated the accident occurred approximately a mile and one-half north of their home.

In the face of the strong evidence that defendant intended to commit suicide by causing this collision, we are not persuaded that the admission of Alex's testimony resulted in a miscarriage of justice.

/////

1
2
3

> In fact, defendant does not argue that the admission of this testimony resulted in a miscarriage of justice.  Rather, he contends any probative value of this evidence was outweighed by its prejudicial effect.  This contention relies on Evidence Code section 352.

4
5
6
7
8
9

> As correctly noted by the People, a general relevance objection is not the equivalent of an objection based on Evidence Code section 352.  (People v. Kirkpatrick (1994) 7 Cal.4th 988, 1014-1015.)  At trial, the only objection made to Alex's testimony was that it was not relevant.  Because there was no specific Evidence Code section 352 objection at trial, this argument was not properly preserved for review.  (Evid. Code, § 353; People v. Kirkpatrick, supra, 7 Cal.4th at 1014-1015.)  Further, this argument has not been properly presented to this court by way of separate argument and heading.  (Cal. Rules of Court, rule 15(a).)  Accordingly, as this contention is not properly before this court, we will not address it.

10   (Opinion at 5-8.)

11         A state court's evidentiary ruling is not subject to federal habeas review unless the

12   ruling violates federal law, either by infringing upon a specific federal constitutional or statutory

13   provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.

14   See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20

15   (9th Cir. 1991).  Accordingly, a federal court cannot disturb a state court's decision to admit

16   evidence on due process grounds unless the admission of the evidence was "arbitrary or so

17   prejudicial that it rendered the trial fundamentally unfair."  Walters v. Maass, 45 F.3d 1355, 1357

18   (9th Cir. 1995).  See also Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  In addition, in

19   order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error

20   was one of constitutional dimension and that it was not harmless under Brecht v. Abrahamson,

21   507 U.S. 619 (1993).  Thus, in order to grant relief, the habeas court must find that the error had

22   "'a substantial and injurious effect' on the verdict."  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th

23   Cir. 2001) (quoting Brecht, 507 U.S. at 623).

24         Here, petitioner's trial was not rendered fundamentally unfair because of the

25   testimony of Alex Tenney.  The entirety of the challenged  testimony on direct examination was

26   as follows:

1       Q. []: Sir, showing you what's been marked People's No. 1 for identification, this is a picture of your father, correct?

2       A. Yes.

3       Q. And what was his name?

4       A. Brian Tenney.

5       Q. And what did your dad do for a living?

6       A. He was an electrical contractor.

7       Q. And he drove a white pickup truck with utility beds on it?

8       A. Yes.

9
10      Q. And what time does your dad usually go to work in the morning?

11      A. Between five and six in the morning usually.

12      Q. And on the morning of October the 27th, two years ago, in
13      1998, did you see your dad as he left for work that morning?

14      A. Yes.

15      Q. How was it you happened to see him that morning?

16      A. Well, he was walking through my room because he didn't want
17      to wake up my mother.  And so he was passing through and he
woke me up when he was passing through and I said "Hi, Dad."
and he said hello and then I said good-bye.

18      Q. And you saw him leave that morning?

19      A. Yes.

20      Q. And do you know where the site of the collision was in this
21      case?

22      A. Yes, I do.

23      Q. How far from your home is that?

24      A. About a mile and a half.

25      Q. Okay.  And that's - - a mile and a half north of where your
home is?

26      A. I believe so.

Q.  Okay.  Do you know how your dad went to work in the morning, which direction he went?

A.  Yeah.

Q.  Is that the direction that he goes to work in the morning?

A.  Yes.

(RT at 1104-05.)  Petitioner's trial counsel did not cross-examine the victim's son and he was excused from the witness stand without additional testimony.  (Id. at 1105.)  His testimony accounts for just over one page of the Reporter's Transcript on Appeal.

The state appellate court assumed that the challenged testimony was not relevant to any issue in dispute at petitioner's trial.  (Opinion at 6.)  That assumption would appear to be clearly well-grounded.  Nonetheless, as noted above, mere error in the admission of evidence alone does not entitle a petitioner to federal habeas relief.  Here, the admission of Alex Tenney's testimony was not so arbitrary or so prejudicial that it rendered petitioner's trial fundamentally unfair.  As the state appellate court noted, the victim's son merely identified his father's photograph and testified briefly regarding his father's daily routine and actions the morning of the crash.  Considering the substantial evidence of petitioner's guilt, it cannot be said that this brief and inconsequential testimony had a substantial and injurious effect on the jury's verdict.[3]

Thus, the state appellate court's conclusion that the trial court's admission of the challenged testimony did not result in a miscarriage of justice in this case was not contrary to or an unreasonable application of federal law.  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim of evidentiary error.

/////

/////

_____

[3]  The substantial evidence of petitioner's guilt included his repeated flirtation with suicide and his admission immediately after the wreck that the crash was the result of his attempt at suicide.

13

C.  <u>Jury Instruction Error</u>

Petitioner claims that the trial court improperly instructed the jury at his trial with CALJIC No. 17.41.1 which states that each juror is to "advise the court of any improper thoughts or intentions expressed by fellow jurors" during deliberations.  (Am. Pet. at 4.)  Petitioner argues that this instruction improperly discouraged the jurors from engaging in a candid exchange of opinions and rendered "the privacy of jury deliberations a fiction."  (<u>Id.</u>)

The California Court of Appeal specifically rejected petitioner's challenge to the trial court's use of CALJIC No. 17.41.1, reasoning in part as follows:

> The record here does not show there was a holdout juror, jury deadlock, or any problem in deliberations.  Defendant does not even make an argument utilizing the standards set forth in <u>Molina</u>. In the absence of any indication in the record that CALJIC No. 17.41.1 had any impact prejudicing defendant, we will not speculate that it did.  (<u>People v. Molina</u>, <u>supra</u>, 82 Cal.App.4th at p. 1336.)

> * * *

> Defendant argues the judgment must be reversed because CALJIC No. 17.41.1 "should not be given in any criminal trial.  It improperly compromises the private and necessarily uninhibited character of jury deliberations, as well as constituting an impermissible anti-nullification instruction."  In his view, the error is "structural," requiring reversal per se.

> * * *

> CALJIC No. 17.41.1 essentially is a summary of [other] instructions, restated in a way that makes it clear each juror has an obligation to inform the court if any other juror refuses to deliberate, expresses an intention to disregard the law, or expresses an intention to decide the case based on penalty or any other improper basis.

> CALJIC No. 17.41.1 does not address either the investigative process after the trial court is advised of the possibility of juror misconduct, or what must be shown in order for the trial court to discharge a juror for misconduct.  As we have just noted, the instruction simply reiterates some of the jurors' duties and informs jurors that they should advise the court if they believe a fellow juror is engaging in misconduct-no more, no less.  Such an instruction, in and of itself, does not intrude upon the secrecy of the deliberative process.

1        Nevertheless, defendant contends the instruction has a chilling
effect on deliberations by making it less likely that a juror will hold
2        fast to a decision disfavored by other jurors for fear that he or she
will be reported to the judge.  This Chicken Little argument ignores
3        the tenacity of hold-out jurors demonstrated daily in California's
trial courts when jurors disagree about the state of the evidence and
4        adhere to the court's admonition that a juror should not "change an
opinion" and "decide any question in a particular way [simply]
5        because a majority of the jurors, or any of them, favor that
decision."  (CALJIC No. 17.40.)

6

7        Simply stated, we are unconvinced that CALJIC No. 17.41.1
operates in any way to coerce a juror to abandon his or her view of
8        the evidence for fear of retaliation by a court which explicitly has
instructed the jurors that: (1) if the court had done or said anything
9        seeming to indicate what the jury should find to be the facts, "you
[the jurors] will disregard it and form your own conclusion"
10       (CALJIC No. 17.30); (2) both the defendant and the People "are
entitled to the individual opinion of each juror" (CALJIC No.
11       17.40); and (3) each juror must not decide any question in a certain
way simply because a majority of the jurors favor that decision
12       (CALJIC No. 17.40).

13  (Opinion at 8-15.)[4]

14        Petitioner's challenge in this federal habeas proceeding to the use of CALJIC No.

15  17.41.1 at his trial is foreclosed by the decision in Brewer v. Hall, 378 F.3d 952, 955-57 (9th Cir.

16  2004).  In Brewer, the Ninth Circuit held that, regardless of the "constitutional merits" of

17  CALJIC No. 17.41.1, federal habeas corpus relief was unavailable in response to a challenge to

18  the giving of that jury instruction because there is "no Supreme Court precedent clearly

19  establishing" that its use violates a defendant's constitutional rights.  378 F.3d at 955-56.  Here,

20  as in Brewer, petitioner "has pointed to no Supreme Court precedent clearly establishing that

21  CALJIC 17.41.1-either on its face or as applied to the facts of his case-violated his constitutional

22  rights." Id. at 957.  Thus, the state appellate court's rejection of petitioner's jury instruction

23  _____

24      [4]  This court notes that in People v. Engelman, 28 Cal.4th 436, 439-40 (2002), the
California Supreme Court held that CALJIC 17.41.1 did not infringe upon a defendant's federal
25  or state constitutional right to trial by jury or his state constitutional right to a unanimous jury
verdict.  However, exercising its supervisory authority over the lower state courts, the California
26  Supreme Court directed that CALJIC No. 17.41.1 no longer be given in future trials because of
its "potential" to intrude on jury deliberations.  Id. at 449.

1   claim was not contrary to or an unreasonable application of clearly established federal law.  28

2   U.S.C. § 2254(d).

3          Moreover, even if the state trial court erred in instructing the jury with CALJIC

4   No. 17.41.1, that error was harmless given the record in this case.  See Brecht, 507 U.S. at 623

5   (holding that a federal court may not grant habeas relief for trial errors without a showing of

6   actual prejudice, defined as a "substantial and injurious effect or influence in determining the

7   jury's verdict").  There is no evidence before this court that the giving of CALJIC No. 17.41.1

8   chilled the jurors' exercise of free speech, prevented free and full deliberations, or allowed for

9   petitioner's conviction on proof less than beyond a reasonable doubt.  Accordingly, petitioner is

10  not entitled to federal habeas relief with respect to this claim.

11         D.  Hearsay Statements

12         Petitioner asserts that the trial judge erred by "allowing a disproportionate amount

13  of hearsay evidence by the prosecution and not allowing a proportionate amount of hearsay

14  evidence for the defense."  (Am. Pet. at 5.)

15         As explained above, absent some federal constitutional violation, evidentiary

16  rulings based upon state law cannot form an independent basis for federal habeas relief.  See

17  Estelle, 502 U.S. at 67-68; Rhoades v. Henry, 596 F.3d 1170, 1177 n.5 (9th Cir. 2010).  Rather, a

18  state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it

19  renders the state proceedings so fundamentally unfair as to violate due process.  Duncan v.

20  Ornowski, 528 F.3d 1222, 1244 n. 10 (9th Cir. 2008); Drayden v. White, 232 F.3d 704, 710 (9th

21  Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal, 926 F.2d at 919

22  ("the issue for us, always, is whether the state proceedings satisfied due process; the presence or

23  absence of a state law violation is largely beside the point").  In this regard, the United States

24  Supreme Court has admonished that the category of infractions that violate "fundamental

25  fairness" has been defined very narrowly.  Estelle, 502 U.S. at 72.  See also Holley v.

26  Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (Noting that the "Supreme Court has made

very few rulings regarding the admission of evidence as a violation of due process.")  Thus, a habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), amended by 421 F.3d 1154 (9th Cir. 2005).  Petitioner has not satisfied his heavy burden that this alleged evidentiary error entitles him to federal habeas relief.

Moreover, petitioner has not identified any of the alleged hearsay evidence that the prosecution or defense where allowed to introduce or not allowed to introduce.  Indeed, in its entirety petitioner's claim in this regard consists of one conclusory sentence in which he does not allege a single fact.  Petitioner's claim for relief is thus vague and conclusory and relief should be denied on that basis alone.  See Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir.1994)).[5]

Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

E.  Ineffective Assistance of Counsel

Petitioner alleges that his trial counsel rendered ineffective assistance by failing to call three defense witnesses, Deputy Sheriff P.J. Dooley, Dr. Samuel Benson, and Mr. Richard Holdstock to testify at petitioner's second trial.[6]  (Am. Pet. at 5.)  Petitioner claims that his counsel's failure to call these witnesses to testify at his second trial "severely weakened petitioner's case, thus, securing a conviction."  (Id. at 5.)

The last reasoned state court decision in response to this claim is that of the Yolo County Superior Court.  That court denied habeas relief as to this claim, reasoning as follows:

---

[5]  Indeed, several of petitioner's claims before this court could properly be characterized as vague and conclusory, with federal habeas relief being properly denied on that basis alone.

[6]  The defense attempted to call each of these three witnesses to testify at petitioner's first trial which ended in a mistrial.

1
2
3
4
5

There is an obvious, very logical explanation why [petitioner's trial counsel] did not call Benson and Dooley in the second trial. The fact is that in the first trial the court had ruled that Dr. Benson's testimony was based on inadmissible hearsay. The court had made the same ruling concerning the interview Dooley conducted with the defendant. Thus, calling either of them in the second trial would have been a useless act. Such a decision could never be described as one which fell below an objective standard of reasonableness. Rather, [petitioner's trial counsel's] actions in this regard demonstrate her professionalism.

6
7
8
9
10

Turning to the decision not to call Richard Holdstock, no objective analysis of this decision would lead one to conclude that this prejudiced petitioner's case. As petitioner points out, Holdstock was an expert in environment health. Holdstock testified in the first trial on the possible effects of carbon monoxide inhalation on Smith's state of mind at the time of the accident. This same subject was discussed in a more straight forward manner during the second trial by Dr. Paul Wuehler, who was a forensic psychologist with impressive credentials.

11
12
13
14
15

Even with all the testimony concerning the petitioner's state of mind which was presented by Dr. Wuehler, the jury in the second trial still convicted Smith of murder. It is not reasonably probable that Holdstock's testimony would have changed the outcome. Thus, petitioner cannot prove that the absence of Holdstock prejudiced this case. Even if Holdstock had testified the result would not have been any different.

16 (Doc. No. 4, Ex. G at 3-4.)

17        The Sixth Amendment guarantees the effective assistance of counsel. The United

18 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

19 Strickland v. Washington, 466 U.S. 668 (1984). To support such a claim, a petitioner must first

20 show that, considering all the circumstances, counsel's performance fell below an objective

21 standard of reasonableness. 466 U.S. at 687-88. After a petitioner identifies the acts or

22 omissions that are alleged not to have been the result of reasonable professional judgment, the

23 court must determine whether, in light of all the circumstances, the identified acts or omissions

24 were outside the wide range of professionally competent assistance. Id. at 690; Wiggins v.

25 Smith, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by

26 counsel's deficient performance. Strickland, 466 U.S. at 693-94. Prejudice is found where

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is, in addition, a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Moreover, "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." United States v. Nersesian, 824 F.2d 1294, 1321 (2nd Cir. 1987).  Reasonable tactical decisions, including decisions with regard to the presentation of the case, are "virtually unchallengeable." Strickland, 466 U.S. at 690.

There is no evidence before this court that trial counsel's decisions with respect to the calling of witnesses at petitioner's second trial was unreasonable.  With respect to Deputy Sheriff P.J. Dooley, at petitioner's first trial Deputy Dooley was called to testify regarding statements petitioner made during an interview conducted several hours after the crash.  (RT at 599.)  The trial court however sustained the prosecutor's hearsay objection before Dooley could testify as to those statements and there were no further questions posed to Deputy Dooley.  (Id. at

600.)  Given the prosecutor's objection and the trial court's ruling at petitioner's first trial with regard to Deputy Dooley's testimony, any attempt to elicit that same testimony at petitioner's second trial would have been futile.  Petitioner's trial counsel was therefore not deficient in failing to call Deputy Dooley to testify at petitioner's second trial.  See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a futile action can never be deficient performance").

With respect to Dr. Samuel Benson, he testified over the course of two days at a pretrial hearing on the defense motion in limine to exclude petitioner's hearsay statement concerning his attempted suicide made after the crash.  (RT at 182, 202.)  Essentially, Dr. Benson testified at that hearing that due to injuries suffered by petitioner in the crash his incriminating statement was unreliable.  However, the trial court ruled that petitioner's statement in which he admitted that was attempting to commit suicide when he crashed into the victim's vehicle was admissible hearsay.  (Id. at 234.)[7]

Given the trial court's ruling at petitioner's first trial regarding the admissibility of petitioner's statement despite Dr. Benson's testimony, any attempt to call Dr. Benson to testify at petitioner's second trial in an attempt to re-litigate the admissibility of petitioner's statement also would have been futile.  See Rupe, 93 F.3d at 1445.  Petitioner's trial counsel therefore did not render ineffective assistance by failing to call Dr. Benson to testify at petitioner's second trial.

Witness Richard Holdstock testified at petitioner's first trial as an environmental health and safety consultant.  (Id. at 546.)  Mr. Holdstock testified regarding the possible effects of carbon monoxide poising on petitioner.  During a lengthy cross-examination Mr. Holdstock acknowledged that his conclusions were based on the "worst case conditions" possible and that under normal conditions "it would be very unlikely" that petitioner was effected by his exposure to the carbon monoxide.  (Id. at 566-67.)  This record establishes that defense counsel was

---

[7]  It does not appear from the record that Dr. Benson actually testified before the jury at petitioner's first trial.

1  intimately aware of Mr. Holdstock as a witness and knew precisely what he could testify to -

2  counsel had offered that testimony at petitioner's first trial.  Counsel appears to have expressly

3  chosen to forego calling him as a witness at the second trial.  Given the limited value, if any, of

4  Mr. Holdstock's testimony at petitioner's first trial, trial counsel's decision not to call him to

5  testify at petitioner's second trial was a reasonable tactical decision.  Moreover, petitioner has not

6  established any prejudice flowing from his counsel's decision not to call Mr. Holdstock to testify

7  at the second trial in light of the testimony he had to offer.

8         For the reasons stated above, the state court's rejection of petitioner's ineffective

9  assistance of counsel claim is not contrary to or an unreasonable application of federal law.

10  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

11         F.  Prospective Juror Bias

12         Prior to the commencement of his second trial petitioner, who is African

13  American, brought a motion to strike the jury panel based upon a lack of African Americans

14  among the prospective jurors.  (RT at 825.)  The trial court denied that motion.  (Id. at 829.)

15  Petitioner asserts that the trial court "committed judicial error" in denying his motion and his

16  request to "call in the jury commissioner to find out in greater detail what the procedure is for

17  jury selection."  (Am. Pet. at 6.)

18         "'[T]he selection of a petit jury from a representative cross section of the

19  community is an essential component of the Sixth Amendment right to a jury trial.'"  United

20  States v. Mitchell, 502 F.3d 931, 949-50 (9th Cir. 2007) (quoting Taylor v. Louisiana, 419 U.S.

21  522, 528 (1975).  In order to establish a prima facie violation of the fair-cross-section

22  requirement the petitioner must show:

23         (1) that the group alleged to be excluded is a 'distinctive' group in
        the community; (2) that the representation of this group in venires
24         from which juries are selected is not fair and reasonable in relation
        to the number of such persons in the community; and (3) that this
25         underrepresentation is due to systematic exclusion of the group in
        the jury-selection process.

26  /////

1   Duren v. Missouri, 439 U.S. 357, 364 (1979).  See also United States v. Torres-Hernandez, 447

2   F.3d 699, 701 (9th Cir. 2006); Thomas v. Borg, 159 F.3d 1147, 1149-50 (9th Cir. 1998).

3          Here, petitioner has not established the existence of the elements necessary to

4   establish a prima facie violation.  Indeed, petitioner's entire claim consists of a mere three

5   sentences, one of which is conclusory and none of which establish the facts essential to support

6   such a claim.  Moreover, in denying petitioner's motion to strike the jury panels the trial judge

7   noted that he had discussed the composition of the jury panel with the local Jury Commissioner

8   and was informed that the panels were randomly selected by a computer program that used DMV

9   and voter registration information.  (RT at 827.)  The computer program "was endorsed by the

10  Administrative Office of the Courts of the State of California" and was used in "at least fifty

11  percent of the counties in the state."  (Id.)  Furthermore, the trial judge noted that he did not find

12  the lack of African Americans on the prospective jury panel surprising given that "the best

13  information available would suggest that the African American population" of Yolo County,

14  where petitioner's trial was held, was only 2.24 percent.  (Id. at 828.)  These observations by the

15  trial judge are not disputed by petitioner and further indicate that absence of factual support for

16  his claim that he was denied a trial by a jury representing a fair cross section of the community.

17         Petitioner has neither pleaded the elements of a prima facie case under Duren nor

18  offered proof of the presence of those elements.  Accordingly, petitioner is not entitled to federal

19  habeas relief with respect to this claim.

20         G.  Remaining Claims

21         Respondent asserts that review of petitioner's claim that his conviction was the

22  result of an overzealous prosecution (claim six), his claim that there was insufficient evidence

23  presented at trial to support his conviction (claim seven), and his claim that the evidence

24  presented at his trial supported only a conviction on a lesser offense (claim eight), are barred by

25  the statute of limitations set forth in 28 U.S.C. § 2244(d)(1).  Petitioner has not responded to the

26  /////

statute of limitations argument advanced by respondent.  Below, the court will address whether

petitioner's three remaining claims have been timely filed in this court.

### 1.  The AEDPA Statute of Limitations

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

Penalty Act ("AEDPA").  AEDPA amended 28 U.S.C. § 2244 by adding the following provision:

> (d)(1) A 1-year period of limitation shall apply to an application for
> a writ of habeas corpus by a person in custody pursuant to the
> judgment of a State court.  The limitation period shall run from the
> latest of-
>
> > (A) the date on which the judgment became final by
> > the conclusion of direct review or the expiration of
> > the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an
> > application created by State action in violation of
> > the Constitution or laws of the United States is
> > removed, if the applicant was prevented from filing
> > by such State action;
> >
> > (C) the date on which the constitutional right
> > asserted was initially recognized by the Supreme
> > Court, if the right has been newly recognized by the
> > Supreme Court and made retroactively applicable to
> > cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the
> > claim or claims presented could have been
> > discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State
> post-conviction or other collateral review with respect to the
> pertinent judgment or claim is pending shall not be counted toward
> any period of limitation under this subsection.

The AEDPA's one-year statute of limitations applies to all federal habeas corpus

petitions filed after the statute was enacted and therefore applies in this case.  See Lindh v.

Murphy, 521 U.S. 320, 322-23 (1997).

### 2.  Application of § 2244(d)(1)(A) & (d)(2)

The California Supreme Court denied petitioner's petition for review on February

14, 2002.  Accordingly, for purposes of federal habeas review, petitioner's conviction became

final ninety days later on May 15, 2002, and the AEDPA one-year statute of limitation period

began to run the following day, on May 16, 2002.  See Bowen v. Roe, 188 F.3d 1157, 1159 (9th

Cir. 1999) (holding that the period of direct review includes the 90-days a petition for a writ of

certiorari with the United States Supreme Court could be filed).

   "The time during which a properly filed application for State post-conviction or

other collateral review with respect to the pertinent judgment or claim is pending shall not be

counted" toward the AEDPA statute of limitations.  28 U.S.C. § 2244(d)(2).  The statute of

limitations is not tolled during the interval between the date on which a judgment becomes final

and the date on which the petitioner files his first state collateral challenge because there is no

case "pending."  Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999).  Once a petitioner

commences state collateral proceedings, a state habeas petition is "pending" during a full round

of review in the state courts, including the time between a lower court decision and the filing of a

new petition in a higher court, as long as the intervals between petitions are "reasonable."  See

Evans v. Chavis, 546 U.S. 189, 192 (2006); Carey v. Saffold, 536 U.S. 214, 222-24 (2002).[8]

---

 [8]  When a state post-conviction petition is determined to be untimely by a state court, there is no statutory tolling of the limitations period under § 2244(d)(2).  Bonner v. Carey, 425 F.3d 1145, 1148 (9th Cir. 2005) (citing Pace v. DiGuglielmo, 544 U.S. 408, 414 (2005)).  See also Carey, 536 U.S. at 226.  However, the Supreme Court has held that in the absence of a clear indication that state habeas petitions were denied as untimely, federal courts must "examine the delay in each case and determine what the state courts would have held in respect to timeliness."  Evans v. Chavis, 546 U.S. 189, 198 (2006).  Thus, if the state court does not explicitly deny a post-conviction application as untimely, the federal court must independently determine whether there was unreasonable delay between state court applications that would render the federal application for habeas relief untimely.  Saffold, 536 U.S. at 226-27.  In what can fairly be characterized as a profound understatement, the Supreme Court recognized that "[g]iven the uncertain scope of California's 'reasonable time' standard, it may not be easy for the [lower federal courts] to decide in each such case whether the petitioner's state-court review petition was timely."  Chavis, 546 U.S. at 199.  In Bonner, the Ninth Circuit noted that it was ironic that the complicated procedure necessitated under the Supreme Court's decision in Pace derives from the AEDPA a statute purportedly designed to streamline and simplify the complicated habeas process.  425 F.3d at 1149 n.20.  As the undersigned has noted before, the same observation is applicable to the case-by-case analysis that federal courts in California must now engage in under Chavis to determine whether state habeas petitions were filed within what California courts would have deemed to be a "reasonable time" had they elected to consider the issue.  See Thomas v. Scribner, No. CIV S-04-0733 MCE DAD P, 2006 WL 2711667, *6, n.14 (E.D. Cal. Sept. 21, 2006).  All the while it becomes more and more clear that the most streamlined way to

1          Here, petitioner did not file his first state habeas petition until March 14, 2003.

2   (Doc. No. 4, Ex. G.)  Petitioner therefore waited 302 days following the commencement of the

3   AEDPA's one-year statute of limitation period before filing his first state habeas petition.  Upon

4   the filing of his state habeas petition on March 14, 2003, the running of the AEDPA statute of

5   limitations period was tolled.  The AEDPA statute of limitations period began to run again on

6   January 28, 2004, after one full round of review of petitioner's state habeas proceedings was

7   completed with the California Supreme Court's denial of his state habeas petition.  (Doc. No. 4,

8   Ex. K.)  Petitioner mailed his initial federal habeas petition, containing the five claims addressed

9   above, to this court on February 29, 2004, 32 days later.[9]  (Doc. No. 1.)

10         As of February 29, 2004, 31 days remained before the expiration of the one-year

11  statute of limitations under the AEDPA.[10]  Petitioner, however, did not attempt to file his

12  amended petition, containing both his five original claims and his three new claims, in this court

13  until 105 days later on June 13, 2004.  (Doc. No. 6.)  This was 73 days after the statute of

14  limitations for the filing of a federal habeas petition had expired.[11]

15

16  ────────────────

    resolve the vast majority of federal habeas petitions would be to address them on the merits.
17  Indeed, the reason that the meaning of "reasonable time" remains unaddressed under California
    law is because the California Court of Appeals and California Supreme Court elect to address the
18  merits in resolving the many habeas petitions which come before those courts instead of being
    side-tracked into analysis of whether any delay in bringing them was reasonable.

19
        [9]  The original federal habeas petition is dated February 29, 2004, though it was not
20  received by this court until March 12, 2004.  (Doc. No. 1.)  However, the date the petition is
    signed is construed as the filing date of the petition.  See Houston v. Lack, 487 U.S. 266, 276
21  (1988) (announcing mailbox rule); Jenkins v. Johnson, 330 F.3d 1146, 1149 n.2 (9th Cir. 2003)
    (applying mailbox rule and concluding that the filing date was when the federal habeas petition
22  was signed).

23      [10]  Because petitioner filed his original petition within the one-year statute of limitations
    the claims raised in that petition, and addressed above by the court, were timely.

24
        [11]  On June 13, 2004, petitioner mailed a request for "Permission to Submit An Amended
25  Petition."  (Doc. No. 6.)  That request was denied on July 26, 2004 because respondent had filed
    an answer to the original petition and petitioner's request was not served on respondent.  (Doc.
26  No. 7.)  Petitioner was granted thirty days to file and serve a motion for leave to amend.  (Id.)  On
    August 19, 2004, petitioner mailed and served his "First Amended Petition."  (Doc. No 8.)

                                                25

1          The state habeas petitions subsequently filed by petitioner after the expiration of

2    the AEDPA statute of limitations cannot revive the statute of limitations and have no tolling

3    effect.  Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("[W]e hold that section

4    2244(d) does not permit the reinitiation of the limitations period that has ended before the state

5    petition was filed."); Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001) (holding that where

6    petitioner filed his state post-conviction relief proceeding "after the AEDPA statute of limitations

7    ended . . . [t]hat delay resulted in an absolute time bar . . . .")  Finally, petitioner has made no

8    argument for equitable tolling of the AEDPA statute of limitations.

9          Accordingly, the three claims raised for the first time in the amended petition are

10   barred by the AEDPA statute of limitations, unless they relate back to the claims in petitioner's

11   original federal petition.

12              3.  Relation Back of New Claims

13          An application for a writ of habeas corpus "may be amended or supplemented as

14   provided in the rules of civil procedure applicable to civil actions."  28 U.S.C. § 2242.  See also

15   Rule 11, Fed. R. Governing § 2254 Cases (providing that the Federal Rules of Civil Procedure

16   may be applied in habeas corpus proceedings to the extent that the rules of civil procedure are not

17   inconsistent with any statutory provision or with the rules governing habeas cases); Fed. R. Civ.

18   P. 81(a)(4) (providing that the Federal Rules of Civil Procedure are applicable to habeas corpus

19   proceedings to the extent that the practice in the proceedings is not governed by federal statute,

20   the Rules Governing Section 2254 Cases, and the Rules Governing Section 2255 Cases).

21          Under Federal Rule of Civil Procedure 15(a), a habeas petitioner may amend his

22   pleadings once as a matter of course before a responsive pleading is served and may seek leave of

23   court to amend his pleading at any time during the proceeding.  Mayle v. Felix, 545 U.S. 644,

24   655 (2005).  Under Rule 15(c), a petitioner's amendments made after the statute of limitations

25   has run will relate back to the date of his original pleading if the new claims arose out of the

26   /////

1  conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

2  Id.

3       In Mayle v. Felix, 545 U.S. 644 (2005), the Supreme Court held that claims raised

4  in an amended habeas corpus petition filed after expiration of the limitations period relate back to

5  claims raised in a timely petition only if the claims "are tied to a common core of operative

6  facts." Id. at 664.  See also Valdovinos v. McGrath, 598 F.3d 568, 574-75 (9th Cir. 2010).  The

7  fact that the claims arise from the same trial, conviction or sentence, without more, is insufficient

8  to support relation back of the claims.  Id.  New claims do not relate back if they depend upon

9  events separate in both "time and type" from those set forth in the original pleading.  Id. at 650.

10  See also Hebner v. McGrath, 543 F.3d 1133, 1138-39 (9th Cir. 2008) (habeas claims based on

11  the admission of evidence at trial and the jury instruction charge after the close of evidence

12  depend upon separate transactions and do not share a common core of operative facts and one

13  does not relate back to the other so as to render the later filed claim timely); United States v.

14  Ciampi, 419 F.3d 20, 24 (1st Cir. 2005) ("[A] petitioner does not satisfy the Rule 15 "relation

15  back" standard merely by raising some type of ineffective assistance in the original petition, and

16  then amending the petition to assert another ineffective assistance claim based upon an entirely

17  distinct type of attorney misfeasance."), cert. denied 547 U.S. 1217 (2006).  See also Hebner v.

18  McGrath, 543 F.3d 1133, 1138 (9th Cir. 2008) (admission of evidence during a trial and the

19  instructions given to the jury after the close of evidence are two discrete occurrences that do not

20  share a common core of operative fact for purposes of the relation back doctrine).

21       In this case, none of the three new claims raised in petitioner's amended petition

22  relate back to the claims set out in his original petition.  In the three new claims petitioner alleges

23  that his conviction was the result of an overzealous prosecution since the evidence was

24  insufficient to justify the conviction, that there was insufficient evidence introduced at trial to

25  support his conviction for second degree murder, and that the evidence presented at his trial

26  /////

supported a conviction only on a lesser offense than second degree murder.  In this regard, all three of petitioner's new claims concern the sufficiency of the evidence presented at his trial.

In contrast, petitioner's five original claims concern errors in the admission of evidence (including hearsay), the composition of the panel of prospective jurors, instructional error, and the effectiveness of his trial counsel.  Thus, none of the claims advanced in his timely-filed initial federal petition relate to or in any way involve a challenge to the sufficiency of the evidence presented at his trial.  Thus, petitioner's three new claims do not arise from the same "core of operative facts," Mayle, 545 U.S. at 664, and there are simply no facts "uniting the original and newly asserted claims."  Id. at 659.  See also Jones v. Woodford, No. CIV 03-1463 J(RBB), 2008 WL 505230 *42 (S.D. Cal. Feb.25, 2008) (new claims that involve different errors and different times from those previously alleged do not relate back to the filing of the earlier federal petition).  Instead, petitioner's three new claims merely arise from the same trial but, nonetheless, depend upon events separate in both time and type from those claims presented in his original, timely-filed petition.

Accordingly, these new claims brought for the first time in the amended petition do not satisfy the requirements of the "relation back" doctrine in the habeas context as explained by the Supreme Court in Mayle.  The new claims are therefore time-barred by the AEDPA statute of limitation.[12]

/////

_____

[12] The court notes that the state of the law both with respect to the stay and abeyance procedure and application of the relation back doctrine was much more unsettled when the court recommended that petitioner's motion for stay and abeyance be granted back on March 24, 2005.  As noted in the findings and recommendations of that date, at the time the question of whether a federal district court could stay a habeas petition to permit exhaustion of additional claims was before the Supreme Court.  (Doc. No. 14 at 3.)  Moreover, a petition for writ of certiorari had just been filed in Felix v. Mayle following the Ninth Circuit's ruling that amendment after the granting of stay and abeyance may be proper as long as the new claims stemmed from the petitioner's trial, conviction and sentence.  (Id.)  In granting stay and abeyance in this case, the court made petitioner aware that respondent was preserving all issues then being presented to the Supreme Court in those cases.  (Id.)

1        4. <u>The Merits</u>

2        Even if petitioner's new claims were not time-barred, the undersigned would find

3 that they lack merit.  Petitioner's three remaining claims are more specific variations on the claim

4 that the evidence introduced at his trial was insufficient to support his conviction for second

5 degree murder.  Specifically, petitioner asserts that his conviction was the result of an

6 overzealous prosecution (claim six) because the evidence introduced at his trial supported only

7 his conviction on a lesser offense, that there was insufficient evidence presented at trial to

8 support his conviction for second degree murder (claim seven) because the prosecutor's case was

9 based only on petitioner's hearsay admission, and that the evidence presented at his trial

10 supported only a conviction on the lesser offense of vehicular manslaughter (claim eight).

11        The Due Process Clause of the Fourteenth Amendment "protects the accused

12 against conviction except upon proof beyond a reasonable doubt of every fact necessary to

13 constitute the crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There

14 is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

15 favorable to the prosecution, any rational trier of fact could have found the essential elements of

16 the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  "[T]he

17 dispositive question under <u>Jackson</u> is 'whether the record evidence could reasonably support a

18 finding of guilt beyond a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir.

19 2004) (quoting <u>Jackson</u>, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces

20 a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

21 on federal due process grounds."  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  In

22 order to grant the writ, the federal habeas court must find that the decision of the state court

23 reflected an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case.

24 <u>Id.</u> at 1275 & n.13.

25        The court must review the entire record when the sufficiency of the evidence is

26 challenged in habeas proceedings.  <u>Adamson v. Ricketts</u>, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

1  vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

2  the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

3  reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of

4  fact could draw conflicting inferences from the evidence, the court in its review will assign the

5  inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

6  relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

7  the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th

8  Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a

9  reasonable doubt" but rather "whether rational jurors could reach the conclusion that these jurors

10 reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court

11 determines sufficiency of the evidence in reference to the substantive elements of the criminal

12 offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

13         In this case, petitioner was convicted of second degree murder in violation of

14 California Penal Code § 187, which reads: "(a) Murder is the unlawful killing of a human being,

15 or a fetus, with malice aforethought."  Malice is then defined as follows:

16         Such malice may be express or implied.  It is express when there is
        manifested a deliberate intention unlawfully to take away the life of
17      a fellow creature.  It is implied, when no considerable provocation
        appears, or when the circumstances attending the killing show an
18      abandoned and malignant heart.

19 Cal. Penal Code § 188.

20         Viewing the evidence introduced at petitioner's trial in the light most favorable to

21 the verdict, this court concludes that there was sufficient evidence from which a rational trier of

22 fact could have found beyond a reasonable doubt that petitioner was guilty of second degree

23 murder.  A month prior to the crash petitioner was found by a police officer on the side of the

24 road.  At that time petitioner had a gun and acknowledged wanting to commit suicide after his

25 girlfriend threatened to end their relationship.  Hours before the crash petitioner's girlfriend again

26 threatened to end their relationship and an altercation ensued during which petitioner threatened

30

1   to commit suicide.  Petitioner then left the residence in his truck and shortly thereafter crashed

2   head-on into the victim.

3           An accident reconstruction expert testified at trial that petitioner was traveling

4   between 63 and 76 miles per hour, in a 50-mile-per-hour zone, at the time of the crash.  He did

5   not apply his brakes prior to the collision and was not wearing his seatbelt.  At the time of impact

6   his truck was three and one-half feet over the center line and into the victim's lane of traffic.

7   When contacted by an emergency responder at the scene, petitioner admitted that the crash was

8   the result of an attempted suicide on his part.

9           Based on this evidence, viewed in the light most favorable to the verdict, the

10  jurors could have reasonably inferred that petitioner acted with implied malice resulting in the

11  unlawful killing of the victim and thus properly convicted him of second degree murder.

12  Accordingly, petitioner is not entitled to federal habeas relief with respect to his insufficiency of

13  the evidence claims even if they were timely presented.

14                              CONCLUSION

15          For the reasons set forth above, IT IS HEREBY RECOMMENDED that

16  petitioner's amended application for a writ of habeas corpus (Doc. No. 69) be denied.

17          These findings and recommendations are submitted to the United States District

18  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-

19  one days after being served with these findings and recommendations, any party may file written

20  objections with the court and serve a copy on all parties.  Such a document should be captioned

21  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

22  shall be served and filed within seven days after service of the objections.  Failure to file

23  objections within the specified time may waive the right to appeal the District Court's order.

24  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir.

25  1991).  In any objections he elects to file petitioner may address whether a certificate of

26  appealability should issue in the event he elects to file an appeal from the judgment in this case.

1  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a

2  certificate of appealability when it enters a final order adverse to the applicant).

3  DATED: December 3, 2010.

4

5

6

7

DAD:6
smith497.hc

_____

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26